CASE 53.—ACTION BY HOWARD ADAMS AGAINST THE AMERICAN TOBACCO COMPANY.—March 8, 1910.

# American Tobacco Co. v. Adams

Appeal from Harrison Circuit Court.

L. P. FRYER, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1. Master and Servant—Injury to Servant—Unsafe Place to Work.—That there were slight ruts in the floor of a warehouse made by wheels of trucks in hauling hogsheads of tobacco over it, and that the roof leaked, so that, when it rained, the floor was always wet at a certain place, did not make it an unsafe place to work to such an extent as to allow recovery for injury to an employe from slipping on the wet floor when pulling a truck which had stalled at that place.

2. Master and Servant—Injury to Servant—Assumption of Risk —Promise to Repair Defect.—Where slight ruts existed in the floor of a warehouse made by wheels of trucks in hauling hogsheads of tobacco over it, and the roof leaked so that, when it rained, the floor was always wet at a certain place, assurance of the master that the floor and roof would be repaired gave an employe injured thereafter by slipping on the floor during a rain while pulling a truck stalled at the ruts no right of recovery; the place not having been intrinsically dangerous to work, danger to employes from such conditions not being anticipated when the request for and promise of repairs were made, the employe not having continued at his work because of such assurance, and the assurance that the defects would be repaired when there was nothing else to do having been given two weeks before the accident, and the employes having had idle days after the assurance and before the accident.

LAFFERTY & LAIL and T. L. EDELEN for appellant.

J. J. OSBORNE and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, Adams, alleging that he was injured by the negligence of the appellant company "in furnishing him an unsafe place in which to work and in furnishing him with unsafe appliances with which to work," sought to recover from the appellant company $1,995. Upon a trial before a jury he was awarded $1,500. The judgment for this amount we are asked to reverse chiefly for the reason that the jury should have been peremptorily directed to return a verdict for the tobacco company.

The facts are these: The tobacco company had a warehouse in Cynthiana in which it prized tobacco in hogsheads. After the tobacco had been put in the hogshead, it would be placed on a low four-wheeled truck and hauled to the place in the warehouse where the screws used in prizing were located. On the occasion that appellee was injured he was in front of this truck pulling it by means of an iron rod, and two other colaborers were behind pushing the truck. When appellee, thus engaged, reached a place on the floor at the tobacco press where it was intended to stop, the truck stalled, and in an effort to start it appellee slipped and fell on his hip and side, bruising him quite severely, but not breaking any bones. At the time and place he slipped and fell the floor was wet and somewhat slippery, caused by the rain then falling, which leaked through a defective roof over the press floor. There was also two worn places in the floor made by the wheels of the truck that were one-fourth or one-half inch deep. The accident happened about half past 9 in the morning, and after appellee and his colaborers had been engaged in this work some two hours and a half.

In 1906-7 Adams had helped prize tobacco for the company in this warehouse, and in 1908, when he was injured, had been working there about two months. He was entirely familiar with the premises. There was no defect in the press or trucks, and the only negligence complained of was in failing to repair the worn-out places in the floor, and in failing to repair the roof so that it would not leak. Adams testified concerning the accident as follows: "Q. What were you doing when you got the fall? A. Pulling a hogshead under the press. Q. Who else was at the hogshead at the time you got the fall working with it? A. John Rorer and Arch Sipples. Q. What was Rorer and Sipples doing? A. Pushing on the hogshead and guiding it. Q. State to the jury whether or not there were any worn places in the floor there near the place under which you pulled the hogshead? A. Yes, sir; there were. Q. How many worn out or uneven places were there in the floor? A. Three, I think. There were two I know, and I think there were three. Q. What wore those places in the floor? A. Pulling those trucks backwards and forwards over them; pulling in and backing out. Q. The truck wheels wore the places? A. Yes, sir. Q. And how deep were these worn places below the level of the top of the floor? A. One-fourth inch or a half inch or five-eighths inch. Q. Was it possible to take the truck with the hogshead of tobacco on it under the press, or take it away from there without pulling it through these worn places? A. No, sir. Q. Where were the wheels of the truck in reference to these worn-out places at the time you fell? A. Setting right on the worn places. Q. Was it raining around there at the time you fell? A. Yes, sir; it was. Q. About how long had it been raining before you fell,

if you know?  A. I think it commenced raining about 7:30.  Q. And you fell about what time?  A. Nine, or half-past 9.  Q. Where were you with reference to where the truck pulls under the press?  A. I was standing right where the hogshead ought to set under the press.  Q. Was the hogshead moving at the time you fell?  A. No, sir.  Q. Had you or any one in your presence said anything to any chief servant of the American Tobacco Company before this injury to you about these worn-out places in the floor?  A. Yes, sir.  Q. Who was it that had said something about it?  A. John Rorer.  Q. To whom did he talk to about it?  A. Mr. Caywood.  Q. What was Mr. Caywood's connection with the tobacco company?  A. He was the weighmaster, and he was supposed to be the general manager of the warehouse over the men.  Q. What did Rorer say to him about these worn places?  A. He told him that they ought to be fixed.  Q. What did Caywood say about it?  A. He said: 'The first time we lay off we will have you and Adams fix it.'  Q. How long before you got this fall did this conversation occur?  A. Twelve or fifteen days or two weeks.  Q. What was said about the roof leaking just where the screw went through the roof, if anything?  A. He said he would have it fixed.  Q. Did Rorer say anything about that?  A. Rorer said, 'It leaks around here,' and Mr. Caywood said, 'We would have that fixed too.'  Q. State to the jury whether the place where you fell was wet or dry?  A. It was wet.  Q. Did you notice before you fell that it was wet?  A. No, sir; it was dry when I went to work that morning.  Q. About how many hogsheads a day do you and Rorer pull under that screw, and press down, head up, and pull to the scales?  A. Well, some days 25, some 30, and some 35.  Q. How

long had those holes been wearing into the floor before the time that you fell? A. Well, there were small places there the winter before that; and the more you work over them the larger they get. They keep wearing out."

On cross-examination he was asked: Q. Was it dry when you went there? A. Yes, sir. Q. And it got wet after you went there? A. Yes, sir. Q. Did you see it? A. No, sir; I didn't see where I fell. I saw it further out on the floor. Q. You saw other places wet? A. Yes, sir. Q. Why do you say you slipped, if you didn't see the wet place? A. It was wet, or I wouldn't have slipped. Q. If there was a wet place and you had noticed, you could have seen it, couldn't you? A. Yes, sir; if I had been noticing. Q. The rain came down from where? A. Where the pipe ran out above where the hogshead sets. Q. Where were you standing when you slipped? A. At that place where the hogshead ought to set. Q. You were pulling when you slipped? A. Yes, sir. Q. Were the other men pushing? A. They were supposed to be pushing. Q. You had been walking backwards and forwards over this place, and hadn't seen the wet place? A. Yes, sir. Q. How many times did you pass over that place that morning? A. I don't know how many times I passed over it. Several times I suppose; but I went in backwards, and out at the sides, and, when I stopped, the hogsheads were setting where the wet place is."

John Rorer, who was assisting in pushing the hogsheads, said he was behind the hogshead six or seven feet from Adams, who was in front of it. "Q. When did the truck stop with reference to the time Adams fell—how short a time before he fell? A. Well, I don't know. We were trying to shove it

under there, and his feet slipped and he fell, and it hadn't been stopped but a few seconds. Q. What caused it to stop? A. Some worn places or sunken places in the floor. Q. Did the truck wheels get into these worn places and cause it to stop? A. Yes, sir. Q. What kind of place did Adams fall in—what condition was the place in that Adams fell? A. It was wet. Q. About how large a wet place was it where he fell? A. Five or six feet across, I reckon. Q. What had wet it? A. Rain leaked in around the screw or pipe that went through the roof. Q. Did you make any complaint to Mr. Caywood about it or any other person about the conditions there? A. Yes, sir; I did. Q. About how long was it before Adams got this fall had you complained? A. Well, I don't remember. I think it was along about the 1st of February I complained about the floor, and the roof too. Q. What did Caywood say about it? A. He told us we could fix the floor some time when we wasn't doing anything—when we caught up—but the floor hadn't been fixed or the leaks repaired when Adams fell. Q. You say that you had an opportunity to fix that place, and it wasn't fixed, and you all went back to work, and no further complaint was made? A. Yes, sir. Q. You say that this wet place was five or six feet across? A. Yes, sir. Q. Anybody could look and see it? A. I did. Q. Couldn't anybody see it? A. I did. I wasn't looking for anybody else. Q. It had been leaking for about how long? A. Ever since I had been at work there when it would rain."

Pearl Ginn testified: "Q. What kind of place was it where Adams fell? A. It was wet. Q. What made that place wet? A. It leaked down from above where the screw went through the roof. Q. Did it leak

around there every time when there was a heavy rain? A. Yes, sir. Q. It had been leaking for about how long? A. Ever since I had been at work there when it would rain.''

This was all the evidence for the appellee as to the condition existing at the time of the accident. It appears from this evidence that with the exceptions of the fact that the roof leaked, and there were some slight ruts in the floor made by the wheels of the truck, the premises as well as the appliances were safe. So that the question is: Did the fact that the roof leaked and there were some slight depressions in the floor make the place unsafe to such an extent as to authorize a recovery in this case. We think not. The fact that there were worn places in the floor did not cause Adams to fall, unless it can be said that these places made it harder to move the truck, and consequently required greater effort on the part of Adams and his colaborers, and that this extra exertion in some way contributed to his fall. But evidently the worn-out places had little to do with Adams falling. The place at which he fell was slippery on account of the rain, and in the exertion required to move the trucks his feet slipped on the wet floor, causing him to fall. If the floor had not been wet, it is not probable he would have fallen. There is no pretense that Adams could not see the floor and its condition. He does not say he did not know of the depressions in the floor, but says that he did not know the floor was wet at the place he fell, although he did know it was wet in other places. Why he did not know it was wet at the place he fell is not apparent. It was in the daytime, and there is no intimation that the building was not well lighted. The leak in the roof was immediately over the place he fell, and

this leak had let the water fall on the floor every time it rained during his entire period of service. It is therefore manifest that the slightest observation or care on the part of Adams would have given him notice that the floor was wet. It had been raining some two hours before he fell, and it is fair to assume that the roof had been leaking for that time, during which he had been over the precise place some six or seven times. His fall was really an accident such as happens when persons slip on wet pavements or places and fall, or, if not, the defects were so obvious as to defeat a recovery. Every person of ordinary intelligence knows that a wet floor is slippery, and that one is more likely to fall than if the place is dry. A person under circumstances like these who is required to walk over a slippery floor in an employment like this which is free from any danger or hazard can not recover merely because he slips and falls. The place was not intrinsically dangerous. The employment was not at all hazardous. The implements used were of the simplest character. The servant under facts like these will not be heard to say that he did not see or know the conditions that existed immediately under his eyes.

But the effort is made to bring this case within the rule laid down when the servant works under an assurance that defective places or appliances will be repaired; and so we will look into this phase of the case. But, before doing so, it may be well to notice that there is no pretense here that the request was made to repair the roof or the floor because of any apprehension that accident or injury might follow the failure to repair. It was not anticipated when the request was made, or when the assurance was given, that the employe would be injured if the repairs were

not made.  The evidence clearly shows that the request was not made in contemplation or anticipation of anything of this kind, or because the place was regarded as dangerous.  Nor is there any suggestion that Adams continued to work because of the assurance that these repairs would be made, or that he would have ceased to work if the assurance had not been given.  It is also shown that the assurance was given some two weeks before the accident, and that the master said the defects would be repaired some time when there was nothing else to do; and, further, that between the time of the assurance and the accident the employes had idle days.

As we understand the rules in reference to the protection of the servant when he continues in an employment after he has called the attention of the master to the fact that the premises or appliances are defective or unsafe, and has an assurance that they will be repaired, they may be summarized generally as follows: (1) If the place is intrinsically dangerous or if the appliances or implements to be used require skill or care in handling to prevent accident or injury, the servant may depend upon the assurance of the master to repair; but if the place is not intrinsically dangerous to work in or about, and the appliances or implements in use are simple in character and those used in ordinary employments, and such as do not require any particular care or skill to operate or handle, the promise of the master to repair will not render him liable if he fails to do so.  (2) The servant must have been induced by the assurance or promise to continue in the employment. (3) If the promise or assurance is that the repair will be made by a specified time, the servant may continue to work on the faith of it until the time speci-

fied; and, if no time is fixed when the repairs are to be made, then the servant has the right to assume that they will be made within a reasonable time, and will be protected by the assurance for such time. (4) If the promise or assurance is made to repair or remedy a condition or situation that is so obviously dangerous that a person of reasonable prudence and ordinary intelligence would understand and appreciate the peril arising from the defective condition, then the servant will not be justified in continuing in the employment on the faith of the assurance or promise, and the master will not be liable on this ground if he does. (5) The complaint of the defective premises or appliances must be brought to the attention of, and the assurance given by, a person superior in authority to the servant making the complaint.

These propositions are supported by the decided weight of authority. They have in one form or another been declared by this court in Louisville Hotel Co. v. Kaltenbrun, 80 S. W. 1163, 26 Ky. Law Rep. 208; Reiser v. Southern Plan. Co., 114 Ky. 1, 69 S. W. 1085, 24 Ky. Law Rep. 796; Bell & Coggeshall Co. v. Applegate, 62 S. W. 1124, 23 Ky. Law Rep. 470; Breckinridge Co., Ltd., v. Hicks, 94 Ky. 362, 22 S. W. 554, 15 Ky. Law Rep. 143, 42 Am. St. Rep. 361. In 26 Cyc. 1209, they are thus stated: "Where the master or some one acting in his place promises to remedy the defect complained of, the servant by continuing in his employment for a reasonable time after such promise does not assume the risk of injury from the defect, unless the danger was so patent that no person of ordinary prudence would have continued work. This rule does not apply in cases of ordinary labor, with common implements

with which the servant is perfectly familiar, or where neither the master nor the servant contemplates any increased danger to the latter from the continued use of the defective appliance." In 20 American & English Encyclopaedia of Law, 127, we find the following: "Where the promise of the master to repair defects, of which the servant has complained, induces the servant to continue in the employment, he may recover for injuries received within a reasonable time for the repair of the defects, unless the danger is so imminent that no reasonably prudent man would continue in the service. In order that the rule stated shall apply, it is necessary that the promise made by the master should have been the cause which induced the servant to continue in the employment." In Bailey on Master's Liability and Injuries to Servants, p. 209, they are announced in this way: "In cases where persons are employed in the performance of ordinary labor in which no machinery is used and no material furnished, the use of which requires the exercise of great skill and care, it can scarcely be claimed that a defective instrument or tool furnished by the master of which the employe has full knowledge and comprehension can be regarded as making out a case of liability. A common laborer who uses agricultural implements while at work upon a farm or in a garden, or one who is employed in any service not requiring great skill or judgment, and who uses the ordinary tools employed in such work to which he is accustomed, and in regard to which he has perfect knowledge, can hardly be said to have a claim against his employer for negligence, if in using a utensil which he knows to be defective he is accidentally injured. The fact that he notifies the master of the defect and asks for another implement,

and the master promises to furnish the same, does not render the master responsible if an accident occurs. A rule imposing such liability in such a case would be far-reaching and would extend the principle 'that it is the duty of the master to the servant and the implied contract between them, that the master shall furnish proper, perfect, and adequate machinery or other materials and appliances necessary for the proposed work' to many of the vocations of life for which it was never intended. The rule is one of just and salutary character, designed for the benefit of those engaged in work where machinery and materials are used, of which they can have but little knowledge, and not for those engaged in ordinary labor, which only requires the use of implements with which they are entirely familiar.'' ' In Thompson on Negligence, after declaring the principle substantially as stated in the foregoing authorities, the author in section 4666 proceeds as follows: "On the other hand, the employe is deemed to accept the risk notwithstanding the promise of the employer to repair the defect. Where the danger is great, obvious, and immediate, such as a reasonably prudent man would not encounter, or where the promise is made by a person not authorized to bind the employer, or where the promise is so vague, indefinite, or conditional that the employe ought not to rely upon it and expect its performance, or where the work is simple and the tools reasonably safe, although out of repair, * * * or where the evidence fails to show that the servant continued in the service by reason of relying upon the promise in the master.'' To the same effect is Labatt on Master and Servant, secs. 418-431. The principles announced in these various text-books are fully supported by the following authorities: Meador

v. Lake Shore R. Co., 138 Ind. 290, 37 N. E. 721, 46
Am. St. Rep. 384; Illinois Steel Co. v. Mann, 170 Ill.
200, 48 N. E. 417, 40 L. R. A. 781, 62 Am. St. Rep.
370; Webster Mfg. Co. v. Nisbett, 205 Ill. 273, 68 N.
E. 936; Gwan v. Harley, 56 Fed. 973, 6 C. C. A. 190;
Holloran v. Union Iron Foundry Co., 133 Mo. 470,
35 S. W. 260; Brewer v. Tennessee Coal Co., 97 Tenn.
615, 37 S. W. 549; Trotter v. Furniture Co., 101 Tenn.
257, 47 S. W. 425; Andrecsik v. N. J. Tube Co., 73 N.
J. Law, 664, 63 Atl. 719, 4 L. R. A. (N. S.) 913, 9 Am.
& Eng. Ann. Cas. 1006; Foster v. Chicago R. Co., 127
Iowa, 84, 102 N. W. 422, 4 Am. & Eng. Ann. Cas. 150.

It is manifest that the conditions did not exist in
this case upon which a servant has the right to de-
pend upon the assurance of the master, and no im-
portance is to be attached to the fact that a request
was made to repair the premises or an assurance
given that they would be repaired. We are well
satisfied that the defects in the premises at which
Adams was working were not of such a character
as to authorize a recovery. If the fact that Adams
fell was not due to an accident that may happen at
any time or place without reference to the safe or
unsafe condition of the premises, then it well comes
within the rule laid down in Shemwell v. Owensboro
& Nashville R. Co., 117 Ky. 556, 78 S. W. 448, 25 Ky.
Law Rep. 1671; Wilson v. Chess-Wymond Co., 117
Ky. 567, 78 S. W. 453, 25 Ky. Law Rep. 1655; Dun-
can v. Gernert Bros. Lumber Co.., 87 S. W. 762, 27
Ky. Law Rep. 1039, and other cases along this line.

The motion for a peremptory instruction should
have been sustained. Wherefore the judgment is re-
versed, with directions for a new trial in conformity
with this opinion.