## Louisville & Nashville Railroad Company v. Reese.

(Decided November 13, 1917.)

### Appeal from Estill Circuit Court.

1. Master and Servant—Safe Place to Work.—A servant, assisting in carrying rails and frogs along a graded bed for tracks in a railroad yard, in process of construction, cannot recover for injuries received in stumbling over a piece of slate or rock upon the surface of the road bed, for the master is not requried to see that the road bed is absolutely safe for passage by its employes engaged in its construction.

2. Master and Servant—Assumed Risk.—A servant, assisting in the construction of a railroad yard, assumes the risk of injury from falling over a piece of slate or rock lying upon the surface of the road bed.

3. Master and Servant—Duty of Master—Assumed Risk.—In the case of a track, undergoing construction or reparation, it is the duty of the master to exercise that degree of care and skill that is ordinarily employed in railway construction; and the servant assumes the risk ordinarily incident to such employment.

4. Master and Servant—Negligence—Evidence—Question for Jury.—In an action for damages for injuries received by an employe in stumbling over a piece of slate or rock on the surface of a road bed in a railroad yard, he was assisting in constructing, evidence that the master permitted loose rocks to be and remain scattered around the surface of the roadbed did not show negligence, and the accident being one of the hazards ordinarily incident to plaintiff's employment, a motion by defendant for a peremptory instruction should have been sustained.

B. D. WARFIELD, WALLACE & HARRISS and ROBERT R. FRIEND for appellant.

J. M. McDANIEL for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

In September, 1913, appellant was building a new railroad yards at Irvine, in Estill county, Kentucky,

the ground having been graded and leveled and the ties placed in position for putting down the rails. Appellee was a member of an extra gang, composed ordinarily of sixteen men, whose duties included carrying rails and "frogs" to where they were needed and placing them in position upon the ties. At the time of the accident complained of, plaintiff, with thirteen, at least, and possibly fifteen, other members of his gang, was carrying a steel frog, about twelve feet long and weighing about 1,000 or 1,200 pounds, along the side of the ties, to where it was to be placed in position, by means of steel bars, to the center of which are attached grappling hooks, called by the witnesses "dogs." There were two men to each "dog," one at either end, and plaintiff was in the third pair of men from the front. After thus carrying the frog some eight or ten steps, plaintiff struck his left foot against a piece of slate or rock about the size of his two hands, which caused him to stumble, allowing the end of the dog, held by him, to strike his right leg above the knee, injuring the ligaments of his leg.

To recover damages for his injuries, plaintiff filed this action against the railroad company, alleging that the injuries resulted from the negligence of the defendant in failing to furnish him a reasonably safe place in which to do his work, in that the ground was rough, uneven, slippery, and dangerous for the work then in progress; and in failing to provide a sufficient number of servants to do the work. The defendant traversed the allegations of the petition and pleaded contributory negligence, which was traversed by reply. The first trial of the case resulted in a verdict for $1,000.00 in favor of plaintiff, which was by the lower court set aside and a new trial granted. Upon the second trial, plaintiff recovered a verdict and judgment for $900.00; and from that judgment this appeal is prosecuted and a reversal sought upon the ground that the court erred in overruling defendant's motion for a directed verdict made at the close of plaintiff's testimony and again at the close of all the evidence.

Plaintiff, at the time of the accident, was about thirty-eight years of age, of at least ordinary intelligence, robust and accustomed to hard manual labor. He had been engaged in the same kind of work for the defendant for some two or three weeks prior to the accident. Plaintiff related the circumstances of his injury in this way: "The place where we were ordered to pick up the frog was smooth. We had carried it to a distance of some 12

or 15 feet when we come on to a rough, uneven, slippery slate bottom, and as we come on to that, me, being crowded behind some of the rest of the crew that was hold of this frog the left foot struck an angling position, the slate, and give me a slip, and the 'dog' caught me above the right knee cap here giving it a twist and a strain. . . . It was a slate rock, and I suppose had been taken from the hill up there. . . . The rock was setting in an angle condition, angling, in a slippery form."

Plaintiff also testified that he had nothing to do with the grading of the ground and knew nothing of the condition of the ground where he slipped and was injured. But, according to his evidence, the place where he slipped was not more than twelve or fifteen feet from where he took hold of the frog, and at or near where he had been at work for some two or three weeks. He certainly knew of the general condition of the grade over which he was required to work; that it was level, but that it was not in a finished condition, because the very work in which he was engaged was a work of original construction; and that the ground was not perfectly smooth, but, in places, somewhat rough and uneven.

James Griffin, who was introduced by plaintiff as a witness in his behalf, testified as to the condition of the ground where the accident occurred, as follows: "Well, it was tolerable smooth, but there was rough places, kind o' in it, not very rough either. There was kind of slate sticking up in the place where it was graded up, something like that, that high, something like that (illustrating). The court: How high was that? How many inches is that? A. Well, about four, something like that, something near four inches, but I couldn't say just exactly. Q. What was sticking up there, what kind of material was sticking up there, rock or slate? A. It was slate, just got out of them banks. Q. You do know that there was some slate rock there? A. Well, yes, there was scattering around, hadn't been dressed right down, you know. Q. This particular place was not dressed, was it? A. Well, it wasn't smoothed down like I have saw it. Q. Was it smoothed down like the rest of it? A. Some of it. There's some of it, you know, where it falls in, it would be more smoother, where they were taking the shovels, or taking off them bottoms, or something or another like that. Q. Around there where this accident happened was smoother in some places than in others? A. Oh, yes. Q. It had been graded off there by the slate

and material and things being carried down out of those two hills above there and spread over the yard? A. Had been throwed in there. Q. It had not, at that place, it had not been surfaced off? A. No, no, it hadn't been surfaced off at all. Q. It was like the rest of the place in the yard, some places had been surfaced off, and some had not been surfaced off? A. Yes, sir. Q. You men there had been carrying frogs and steel over the surfaced out part and over the unsurfaced part? A. Yes, sir. Q. Mr. Reese had been helping you do that before that time? A. Oh, yes, had been handling it. Q. He knew the condition of the yard there? A. Yes, sir, he had been working there several days.''

This is all the evidence introduced by the plaintiff as to the condition of the ground. The defendant introduced but one witness, Bryan Sherrard, who testified that, ''at the place of the accident, the filling was done with slate, and that was just like the rest of it, that part of the yard was graded with slate; you know, filled in with slate and part of it with dirt.''

From this evidence, it is apparent that the character of work in which plaintiff was engaged, at the time of the accident, was that of original construction; that the ground had been leveled by filling with slate and dirt; that it had not been dressed down; that pieces of slate were scattered around over the ground; and that plaintiff, having been engaged for several weeks in carrying steel over this ground to the places where it was needed in the construction of the unfinished track, necessarily knew of its perfectly obvious condition.

In Whitson v. American Bridge Co. of N. Y., 158 Ky. 814, this court sustained the action of the trial court in giving a peremptory instruction in favor of the defendant where a carpenter was injured, while assisting in carrying crossties from their place in a pile to skids, by tripping over a stump that was in the way. After holding that the carrying of the ties to the skids was a service contemplated by the terms of his employment and stating the thoroughly established rule that the master is under the duty of using ordinary care to furnish his servants a reasonably safe place to work in, and that the servant did not assume the risk of danger arising from the master's failure of duty in this respect, unless he knows of the danger or it is so obvious and patent as to charge a person of ordinary prudence with notice, we said:

"The master, however, is not an insurer of the safety of the servant. He is not required to take precautions against every possible accident, however improbable or unlikely its occurrence. He is only bound to use reasonable care in guarding against such accidents as may be anticipated by a person of ordinary prudence. Whether or not a place is reasonably safe varies with the character of the work and the circumstances of its performance. A hole or obstruction in the floor of a building might render it unsafe for an employe who had the right to use the floor and to assume that the master had made it reasonably safe, whereas the same hole or obstruction on the ground, where the light was abundant, might not render the premises unsafe for a carpenter whose work was necessarily of such a character as to require him to take notice of those things which were right before his eyes. Thus it will not be contended that the master is under the primary duty to see that every space in the building is covered, or that every obstruction is removed from the pathway of the carpenter engaged in the construction. From the very nature of the work there will be openings through which he may fall, or obstructions with which he may come in contact. If the carpenter is at work on the ground he may come in contact with the tool-box or bench, a step, a fence, or a piece of timber. The master's duty to furnish the carpenter a reasonably safe place to work does not require him to cover up such openings or remove such obstructions, which are necessarily incident to the work, so that the carpenter cannot fail to see them except by his own neglect. So, too, where the carpenter is engaged in bridge construction, and is at work on the ground carrying and preparing timbers to be used in the bridge, there will necessarily be inequalities in the ground and obstructions in his way to which he cannot close his eyes. Here there was no obstruction in a beaten pathway along which the carpenters were required to go. They simply passed over the rough ground in carrying the tie from the pile to the skids. It would be carrying the safe-place doctrine too far to say that under these circumstances the master was required to see that every slight depression in the earth was filled; that every tie or other piece of timber was moved out of the way; that every rock was removed or that every broken fence post was taken up. The obstruction not being concealed, and the work being performed in the broad daylight, the master has a right to assume that the servant will see, and the law imposes

upon the servant the duty to see, such obstructions as are open and obvious to any person making use of his own eyes. Williams v. L. & N. R. Co., 111 Ky. 822, 64 S. W. 738; Bailey on Master and Servant, page 826; American Tobacco Co. v. Adams, 137 Ky. 414, 125 S. W. 1067; Harper v. I. C. R. Co., 115 S. W. 198; Lee v. C. & O. Ry. Co., 18 R. 829, 38 S. W. 509.''

With equal justice, it may be said with reference to the facts of the instant case, that it would be carrying the safe-place doctrine too far to say, the master was required to see that every slight depression in the earth was filled; that every rock was removed; or that every piece of slate, used in making the fill, had been covered with dirt.

The duty of the master to furnish a reasonably safe place to his employes is thus stated in Wilson v. Chess & Wymond Co., 117 Ky. 567:

''The duty of the master to furnish a safe, or reasonably safe, place in which the laborer may do his work, is frequently either misunderstood or misapplied. In the first place, the master is not required to furnish an absolutely safe place. If the work is in and of itself dangerous, the master does not insure against such danger. On the contrary, there is nothing better settled than that the servant assumes the ordinary risks and hazards incident to the character of his work. Whatever may be the moral obligation resting upon those who employ people in hazardous work to furnish the safest possible means to protect them from injury, the law does not forbid a laborer's undertaking a hazardous employment with full knowledge of its dangers, if he wants to. If he does, the law leaves the risk upon him, for he has assumed it. There is no feature of the law of negligence better settled than this.''

There is, however, a very obvious distinction between the duties of the master with respect to a safe place to work and the assumption of risk by the employe, upon a finished road bed and upon ground where a railroad has not been completed, but is in process of construction. Bailey on Personal Injuries (2nd Ed.), vol. II, page 1005, thus states the distinction:

''The general rule, with respect to safe place is applicable to railroads in a state of completion, but is subject to qualifications as to roads out of repair while being reconstructed as well as to new roads in process of construction. Generally, the condition of such roads is an ordinary risk incident to the employment of a servant

engaged in such work of construction. 'An employe,' it has been said, 'cannot complain of the imperfect condition of the road he is employed to assist in making perfect. He must take the risk naturally incident to such employment. He assumes greater risks upon such a road than upon a completed one.' "

In Thompson on Negligence, vol. IV, sec. 4794, the rule is thus stated:

"There is an obvious distinction between the extent of the assumption of the risk by the railway servant in the case of a track which has been completed and is open for public service (in which case he may rightfully assume that the company has done its duty in making it reasonably safe), and in the case of a track undergoing construction or reparation. In the latter case, the employe is entitled to expect no more than a degree of care and skill equal to that ordinarily employed in railway construction, and he consequently assumes the risk of injury due to the fact of the track being unfinished, where this degree of care and skill has been used."

There is no evidence even tending to show that the defendant railroad company had not exercised that degree of care and skill that is ordinarily used in such railway construction to make the place where plaintiff was employed, at the time of the accident, reasonably safe and therefore no negligence was proven. The mere fact that there were loose rocks scattered about upon the ground and plaintiff stumbled over one of these rocks is, of itself, under such circumstances no evidence of negligence. Moreover, the proof convinces us that the accident to plaintiff was one of the ordinary hazards, incident to the character of his work, and we are unable to avoid the conclusion that the trial court erred in refusing the peremptory instruction asked for by the defendant.

2. The trial court refused to submit to the jury the question of the alleged negligence of the defendant in failing to provide a sufficient number of men to do the work plaintiff was engaged in, although plaintiff offered an instruction upon that question. Counsel for plaintiff, insisting that this was error, requests that, in the event of a reversal, we consider and decide this question for the purposes of a new trial. There is no evidence whatever that the force employed with plaintiff was insufficient, unless it be that the extra gang usually consisted of sixteen men, and at the time of the accident, only fourteen were engaged, but whether there were, at the

time of the accident, only fourteen men engaged is placed in some doubt by the plaintiff's witness, John Griffin, who testified that if any of the sixteen men were absent he did not know of it. Assuming, however, that there were but fourteen men engaged in the work, at the time of the accident, that fact alone does not prove that this was an insufficient force for the work. It is shown by this same witness for plaintiff that the frog weighed about 1,000 or 1,200 pounds, a weight of less than 100 pounds upon each of fourteen men; but, whether this was an unusual or unreasonable load, for the short distance the frog was to be carried, there is no proof whatever. It is, therefore, clear that the court did not err in refusing to submit this question to the jury.

Wherefore, judgment is reversed and cause remanded for a new trial consistent herewith.